IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 18, 2017 Session

## TRANSFILL EQUIPMENT SUPPLIES & SERVICES, INC. v. ADVANCED MEDICAL EQUIPMENT, LLC

**Appeal from the Circuit Court for Sumner County**
**Nos. 83CC1-2013-CV-1241, 83CC1-2013-CV-1242   Joe Thompson, Judge**

———————————————————

### No. M2016-00288-COA-R3-CV

———————————————————

In this breach of contract case, Transfill Equipment Supplies & Services, Inc. (TESS) sued Advanced Medical Equipment, LLC (AME) for delinquent payments of (1) rent due on TESS's equipment, (2) purchases of medical oxygen, and (3) the fair market value of rented equipment that AME had not returned to TESS.  AME filed a separate lawsuit against TESS seeking damages for conversion of oxygen tanks.  After consolidating the cases, the Sumner County General Sessions Court awarded damages to TESS and dismissed all of AME's claims.  AME appealed to the trial court.  The court found that AME was guilty of breach of contract due to its failure to make timely payments.  As a consequence, the court awarded judgment to TESS in the amount of $34,999.45.  The trial court also found that TESS had not converted AME's oxygen tanks.  AME appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Clement J. Carlton, Huntsville, Alabama, and Walter Stubbs, Gallatin, Tennessee, for the appellant, Advanced Medical Equipment, LLC.

Arthur E. McClellan, Gallatin, Tennessee, for the appellee, Transfill Equipment Supplies & Services, Inc.

**OPINION**

**I.**

TESS is engaged in the business of filling tanks with medical oxygen, as well as renting and selling oxygen tanks for medical use. AME provides already filled oxygen tanks for patients with respiratory needs. TESS and AME commenced doing business under the terms of a written pricing contract executed by AME on September 30, 2004. The contract establishes the prices for filling various sizes of oxygen tanks, the prices for renting oxygen tanks, and delivery fees. The contract also provides that, in case of litigation, "[t]he prevailing party shall be awarded its costs and legal fees." The contract contains the following provision:

> **Replacement Cost for the Rental Cylinders and Equipment if lost will be Market Replacement Price, and Rental Charges continue until Equipment and Cylinders are returned o[r] purchased at Market Value.**

(Bold font in original.) The parties operated under this contract until May 3, 2010, when the parties executed a new contract that adjusted the prices.

During the course of the business relationship, AME would provide TESS with AME's own tanks and AME would pay for the oxygen to fill the tanks. AME also rented tanks from TESS. AME paid rental charges and also paid for the medical oxygen provided by TESS. In addition to delivering filled tanks to AME, TESS would pick up its empty rental tanks and the AME tanks to be filled. TESS provided a delivery ticket to AME. The delivery ticket, signed by the TESS driver and by AME, contains the following language: **"[b]y signing this delivery ticket, I agree that all items and quantities are correct."** (Bold font in original.) In addition to the delivery ticket, TESS provided AME with a distribution log specifying the size, type, and number of tanks that were delivered.

When the delivery vehicle arrived back at the TESS facility, TESS verified the accuracy of the information on the delivery ticket. David Graves, TESS's president and CEO, testified regarding this process as follows:

> [E]very time a truck goes out and makes a delivery, somebody other than a driver goes on and reverifies every cylinder on that truck. . . . [T]here are times that deliverers will pick up a tank and pick up a customer tank that should have been a rental. They'll pick up a rental tank that was a customer's tank. That's the whole purpose in verification. There are times that they'll go in and pick up cylinders, and . . . there are times there may be 20 and they say there's 19. And if there is, we correct the delivery ticket, fax a copy back

to the customer, and we bill off of the corrected delivery ticket before it's there when it gets back in our facility, if there's an error[.]

AME asserts that this verification process has led to overbilling by TESS and, further, that TESS has converted AME-owned tanks through this process. Furthermore, AME claims that this verification process at the TESS facility indicates that TESS has conducted its business with AME in bad faith, unfairly, or in a commercially unreasonable manner.

Because TESS fills both customer-owned tanks and its own tanks that are rented to customers, TESS must differentiate between its tanks and those of AME for accurate billing. Graves testified regarding how TESS differentiates between tanks. He stated that

TESS rental cylinders are very clearly marked. They either have "TESS" spray painted down the side of them and they have a green ring spray-painted at the very bottom of them or else they've got our logo under the clear coat of the cylinders. And our steel tanks have TESS neck rings on the top of them they say "property of the TESS Company, Gallatin, Tennessee." . . . They are clearly identified.

The record reflects that it is common in the medical gas industry for tanks to be lost. Graves testified about this problem, stating that in "the durable medical equipment industry and the home oxygen equipment, it is an accepted standard that [tanks] are lost. . . . They're constantly lost. In the industry, . . . tanks don't always come back to the home care company that puts them out on the patients." AME acknowledged this problem when it questioned Graves at trial. AME's counsel asked Graves whether he had "told [AME] that the average loss in the industry, for rental tanks, is 17 percent per year[.]" Suffice it to say that both parties agreed that it is common in the industry for tanks to become lost.

Early in the business relationship, AME struggled to keep its payment account with TESS current. Graves testified that

[f]rom the day this account opened in 2004, they have been delinquent. There have been phone calls, credit holds, trying to get payment and everything else."

In October 2007, TESS notified AME that it was placing a hold on AME's account and that it would cease doing business with AME until the delinquency on the account was resolved. AME responded with a proposed payment plan under which it would pay

- 3 -

$4,000 and then would set up weekly payments of $1,000. AME made the $4,000 payment, and business between the parties resumed. Subsequently, AME continued to have trouble making timely payments to TESS. In September 2008, Graves sent a letter to AME regarding the growing past due balance on AME's account, stating that the balance on the account was $30,046.54 with $27,995.29 past due. He also claimed that AME still had equipment rented to AME with a replacement value of $22,646. In that letter, Graves notified AME that its account was being put on hold until a payment arrangement could be reached. Business between the parties recommenced after AME made a payment to TESS. In February 2010, a payment that AME made to TESS in the amount of $500 was returned for insufficient funds. As a result, TESS again placed AME's account on hold. TESS ceased doing business with AME on June 5, 2012.

TESS pressured AME to make arrangements to pay the balance on its account. AME expressed concerns over the balance due, questioning the validity of the number of outstanding rental tanks for which it was being charged. AME made some payments on its balance, but failed to bring its account current. In a September 2012 email to TESS, AME asked if TESS could "please try to make a decent offer . . . to settle the equipment issue. I would like to be fair." In October 2012, Graves provided AME with the number of and types of rental tanks that had not been returned and an amount for which TESS was willing to settle the equipment charges. He also scheduled a meeting with AME to review all of the delivery tickets and the charges for outstanding rental tanks. In November 2012, TESS provided AME with its business records detailing AME's account balance in an attempt to resolve the parties' disagreement.

This matter was not resolved. AME remained in a delinquent status. In December 2012, counsel for AME sent a letter to TESS asserting that AME-owned tanks that TESS had picked up for filling had not been returned, and he demanded the return of such tanks. Counsel for TESS responded with a letter demanding payment of AME's account balance by January 8, 2013.

On January 10, 2013, TESS filed a civil warrant against AME in the Sumner County General Sessions Court seeking damages for breach of contract on a sworn account. TESS claimed that AME owed payments for medical gas provided by TESS, rent on TESS tanks, and the replacement cost for TESS-owned tanks that had not been returned. AME disputed the amount of TESS's claim. AME filed a sworn denial stating that

> [t]here [are] multiple errors and changes made by TESS upon documents it uses. I cannot authenticate or dispute Delivery Tickets without the originals. I will not agree to use copies at a trial. The [audit] is unreliable. TESS never provided a complete history of payments by AME to verify a claimed balance owed.

- 4 -

AME filed a separate action in the same court against TESS alleging conversion of personal property. The Sumner County General Sessions Court consolidated the cases. It dismissed AME's conversion claim and awarded $18,094 in damages to TESS for breach of contract and $4,099.50 in attorney's fees.

AME appealed to the trial court. In awarding TESS a judgment, the court made extensive findings of fact:

> TESS entered into a contract with [AME] on September 24, 2004 (the "2004 Agreement").
>
> The parties operated under the 2004 Agreement until they executed a new contract on May 3, 2010 (the "2010 Agreement"). The 2010 Agreement was very similar to the 2004 Agreement, with only minor price adjustments.
>
> *       *       *
>
> Significantly, both the 2004 Agreement and the 2010 Agreement contained the following provision:
>
>> Replacement Cost for the Rental Cylinder and Equipment if lost will be Market Replacement Price, and Rental Charges continue until Equipment and Cylinders are returned or purchased at Market Value.
>
> The 2004 and 2010 Agreements each contained an attorney's fee provision that awarded "costs and legal fees" to the prevailing party in the event of a dispute.
>
> As far back as October 15, 2007, AME experienced difficulty in keeping its account current. At that time, David Graves, on behalf of TESS, notified Joy Cartron, [(AME's owner) and] his principal contact at AME, that a credit hold was being placed on AME's account.
>
> Ms. Cartron responded shortly thereafter with a promise to bring the account current by mailing an initial payment of $4,000 and thereafter making weekly payments of $1,000 each.
>
> Again as of September 24, 2008, AME had become

delinquent on its account with TESS, owing at a time a total of $30,046.54, of which $27,995.29 was past due. In addition, AME then had in its possession a number of rental cylinders, which cylinders carried an aggregate fair market value of $23,646[].

\* \* \*

On February 22, 2010, TESS deposited a payment from AME in the amount of $500. Three days later, the check was not honored by AME's bank and was returned for insufficient funds.

As a result of the returned check, TESS sent a letter to AME once again placing AME on credit hold. In addition, TESS required AME to make all future payments in certified funds. TESS also noted in the letter that it would "continue to pick up the TESS rental cylinders to help reduce the amount your company is invoiced."

Despite these difficulties, TESS continued its business relationship with AME and continued to deliver gases to AME under the terms of the 2004 and 2010 Agreements.

After execution of the 2010 Agreement, David Graves traveled to Alabama to meet with representatives of AME to talk about ways in which AME could reduce its cylinder rental charges.

\* \* \*

TESS stopped doing business with AME on May 1, 2012, when AME last took possession of a rental cylinder owned by TESS.

On August 22, 2012, TESS, through Margaret Graves [(TESS's credit manager)], initiated an email exchange with AME regarding the overdue state of AME's account. That led to an email from Andrew Thompson [(AME's office manager)] to Margaret Graves, questioning the accuracy of TESS's claim that AME was still in possession of between "100-200 or more" of TESS's rental tanks.

- 6 -

On September 7, 2012 – the day after AME raised concerns about the number of rental tanks that TESS claimed were in AME's possession – AME sent a payment of $1,000 to TESS.

Three days later, David Graves contacted Andrew Thompson by phone to discuss possible discrepancies between TESS and AME with respect to missing rental tanks. By email dated September 11, 2012, Margaret Graves referenced the phone conversation between David Graves and Andrew Thompson.

AME did not respond to TESS's September 11, 2012 email.

On September 18, 2012, Margaret Graves at TESS emailed Andrew Thompson at AME, requesting a payment on AME's overdue account. Thompson responded within 4 hours, stating: "Shouldn't be a problem by end of month." Thompson made no reference to the issue of disputed rental tanks.

[O]n September 19, 2012, Joy Cartron emailed Margaret Graves, seeking a resolution to the disputed tanks issue. Cartron indicated that she "would like to continue to do business," and asked Graves: "Can you please try to make a decent offer with me to settle this equipment issue." Moreover, Cartron was reluctant to undertake her own review of the rental tank history, indicating she would only do so if she had to.

\*       \*       \*

On October 18, 2012, David Graves notified Joy Cartron that he would be working on the AME account to address the situation of "lost cylinders." Joy Cartron responded the same day and was silent with respect to David Graves' characterization of the cylinders as "lost."

On the following day, October 19, 2012, David Graves notified AME that TESS would charge AME for the lost rental cylinders.

On the following day, Joy Cartron admitted that customers of AME had kept many of the rental tanks, and that she needed tracking numbers to see if she could charge the replacement

cost to those customers.

> On October 30, 2012, David Graves offered to travel to Huntsville, Alabama to meet with Joy Cartron to "go through all the delivery tickets."
>
> . . . Joy Cartron responded "sounds good," indicating that she could "at least find out by my log who has tanks and try to get them back or charge the price to them."
>
> The parties mutually scheduled a meeting for November 20, 2012 at 10:30 AM in Huntsville, Alabama. On November 20, Joy Cartron chose not to attend the meeting, instead sending a subordinate, Whitney Cato, to attend the meeting.
>
> AME continually had difficulty in maintaining its records in a professional, business-like manner.
>
> TESS properly billed AME for gases, tank rental, and tank purchases.
>
> At the time when TESS terminated its relationship with AME, AME owed TESS the sum of $10,253.45 for purchases of gas and tank rental, and $7,841[] for the fair market value of TESS tanks retained by AME.
>
> The court explicitly finds the testimony of David Graves and Margaret Graves to be consistent and credible. Conversely, while the court does not find the testimony of Joy Cartron to be purposefully untruthful, the court finds her testimony to be wholly unreliable.

(Paragraph numbering and citations to exhibits in original omitted.) The court concluded that "AME breached its contract with TESS by failing to make timely payments when due." The court held that TESS is entitled to recover (1) $10,253.45 for purchase of gases and rental of tanks; (2) $7,841 for fair market value of TESS tanks in the possession of AME; and (3) $16,905 in attorney's fees. The court's award totaled $34,999.45. Furthermore, in its final order, the court found that TESS did not convert AME's tanks. AME appeals.

## II.

AME raises the following issues as quoted verbatim from its brief:

- 8 -

Did the trial court fail to adhere to the mandate of Tenn. R. Civ. P., Rule 52.01 by failing to make findings of fact and separate legal conclusions for every issue presented during the trial court proceedings?

Does the evidence preponderate to establish TESS has converted oxygen cylinders (tanks) because the evidence supports another finding of fact with greater convincing effect than the trial court's legal conclusion that TESS did not convert AME tanks? Said another way, Does the preponderance of evidence establish the elements of conversion of AME's oxygen cylinders (tanks) by TESS?

In its course of business dealings with AME, has TESS dealt in bad faith, unfairly, or in a commercially unreasonable manner?

(Paragraph numbering in original omitted.)

### III.

When, as here, the trial court sits without a jury, we review the trial court's findings of fact in the record with a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister,* 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law under a de novo standard with no presumption of correctness attaching to the trial court's legal conclusions. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

### IV.

### A.

AME argues that "the trial court's Memorandum and Final Order [are] insufficient to meet the mandates of Rule 52.01." That rule provides as follows:

In all actions tried upon the facts without a jury, the court shall find the facts specifically and shall state separately its conclusions of law and direct the entry of an appropriate judgment. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

The Supreme Court has stated the following with regard to the sufficiency required:

> There is no bright-line test by which to assess the sufficiency of factual findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."

*Lovelace v. Copley*, 418 S.W.3d 1, 36 (Tenn. 2013) (internal citations omitted).

With regard to a court's failure to make sufficient findings, the Supreme Court has previously found that

> [o]ne remedy courts typically apply when a trial court's factual findings fail to satisfy the Rule 52.01 requirement is to remand the case to the trial court with directions to issue sufficient findings and conclusions. Alternatively, an appellate court may choose to remedy the trial court's deficient factual findings by conducting a de novo review of the record to determine where the preponderance of the evidence lies.

*Id.* (internal citations omitted).

In its brief, AME states the following:

> [H]ere is what AME contends makes the trial court's Memorandum and Final Order insufficient to meet the mandates of Rule 52.01. The most compelling reason is because TESS used delivery tickets to determine the billing it would submit to AME for filling tanks, transportation of the tanks, and, more importantly, the rental of tanks. . . . The specific words "credits" and "delivery tickets" do not even appear in the Memorandum or the Final Order filed by the trial court. . . . The trial court made no findings regarding the ability or inability of TESS delivery persons to identify and distinguish tanks owned by each of the parties. . . . The trial court rendered no factual finding or legal conclusion to determine ownership of all the tanks unilaterally shifted by TESS so that it could claim ownership.

We are not persuaded by this argument. The fact that the trial court did not use the words "credits" or "delivery tickets" does not render the factual findings insufficient. Rule

52.01 provides that an opinion "will be sufficient if the findings of fact and conclusions of law appear therein."  The fact that the trial court did not use specific language in its recitation of the facts and did not find the facts as AME believes it should have does not render the trial court's findings to be insufficient.

The trial court found that AME was attempting to track TESS rental tanks that it had provided to customers so that it could charge the replacement costs to those customers.  It also found that AME was attempting to settle the issue of missing tanks with TESS and that AME had an issue maintaining its business records.  According to the trial court, TESS properly billed AME and that "[a]t the time when TESS terminated its relationship with AME, AME owed TESS the sum of $10,253.45 for purchases of gas and tank rental, and $7,841[] for the fair market value of TESS tanks retained by AME." These facts are sufficient to support the trial court's legal conclusions that AME breached the contract with TESS and that TESS did not convert AME tanks.

AME also challenges the court's award of damages, arguing that "AME and the court of appeals cannot determine how the trial court arrived at its award of damages favoring TESS."  It argues that "[t]he damages awarded by the trial court are not capable of reasonable interpretation [and that the] trial court completely ignored the issue of credits, both factually and legally."  We disagree.

While there is some question as to the process the trial court used in calculating its award of damages and its application of credits, we do not find that the evidence preponderates against the trial court's award.  We have previously stated the following with regard to damages:

> The amount of damages to be awarded is a question of fact. The amount of damages appropriate in a particular case depends on the particular situation, and, thus, determinations concerning the amount of damages are factually driven. Consequently, . . . the standard of review of the amount of damages awarded by a trial court sitting without a jury is the standard generally applicable to appellate review of findings of fact.  Under that standard, we review the record de novo and afford the trial court's findings of fact a presumption of correctness unless the evidence preponderates otherwise.

*Wisdom v. Carder*, No. M2005-02207-COA-R3-CV, 2007 WL 595530, at *2 (Tenn. Ct. App., filed February 26, 2007) (internal citations omitted).  Thus, we hold that the trial court's damages calculation is correct unless the evidence preponderates against its award.  The trial court had hundreds of pages of delivery tickets with thousands of entries and the records regarding TESS's billing of AME to review.  Based on its review of the record, the court awarded judgment to TESS in the amount of $34,999.45.  The burden is

on AME to demonstrate to this court that the evidence preponderates against that finding. This it has failed to do. AME has also failed to pay the balance claimed by TESS. It has also failed to demonstrate its calculation as to what it claims TESS is entitled. Based on the trial court's review of the voluminous record before it, the trial court calculated and awarded damages awarded to TESS. Simply stated, the evidence does not preponderate against the trial court's damage award.

AME's argument that the trial court completely ignored the issue of credits is also without merit. It is clear from the trial court's award that the court provided some credits to AME. In TESS's response to alleged delivery discrepancies or defects, TESS asked the court for $42,594.31. TESS's motion to alter and/or amend asked for an increase in the trial court's award to $43,884. Since the court's award of $34,999.45 is significantly less than the amount TESS requested, it is logical to assume that the court awarded AME some offsetting credits. We find that, while it is not entirely clear how the trial court calculated the sum it awarded, the evidence does not preponderate against the trial court's factually-driven determination of damages.

**B.**

AME argues that the trial court erred in finding that TESS had not converted AME tanks. In the trial court's memorandum and order, it specifically found that David Graves's testimony was "consistent and credible" while it found that Joy Cartron's testimony was "wholly unreliable." In the trial court's final order, the court noted that it "affirmatively finds through its determination as to the credibility of the witnesses, as well as, through the preponderance of the evidence presented, both documentary and oral, that [AME] breached its contract with [TESS] and, that [TESS] did not convert [AME's] tanks." The trial court's credibility determination is accorded great weight. The Supreme Court has stated the following:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.

***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). In the case before us, the trial court explicitly gave weight to the credibility of the witnesses in determining that TESS had not converted AME's tanks. Based on this credibility determination and the evidence presented, the trial court concluded that TESS had not converted AME's tanks.

- 12 -

To be successful in an action for conversion, a party must prove the following: "(1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel." *White v. Empire Exp., Inc.*, 396 S.W.3d 696, 720 (Tenn. Ct. App. 2012). Furthermore, "[t]o state a cause for misappropriation or conversion, under Tennessee Rule of Civil Procedure 9.02, [AME] would need to plead all acts of misappropriation with particularity." *PNC Multifamily Capital v. Bluff City*, 387 S.W.3d 525, 555 (Tenn. Ct. App. 2012).

In its action against TESS, AME's warrant claimed "conversion of personal property[,] *i.e.* D cylinders, M6 cylinders, and E cylinders in the amount of twelve thousand five hundred ($12,500[] ) dollars." In the trial memorandum filed in the court by AME on the day before the court issued its memorandum opinion and order, AME concluded that "[t]he computation of the known converted tanks should include not only the tanks unilaterally transferred by TESS from 2005 through 2012, but also obvious errors in the audit . . . and the undelivered . . . tanks." It claimed a total market value of converted tanks of $12,802.07. These assertions, however, fail to prove the elements of conversion or the existence of "known converted tanks." In its trial memorandum, AME admits that it "tracked the tanks it owned by serial number." AME claims that TESS converted 46 tanks in 2005 and 164 tanks in 2006. Rather than providing evidence of its tracking of the specific tanks which it asserts TESS took and never returned, AME simply asserts that every alteration of the delivery tickets by TESS resulted in the conversion of those tanks. The trial court specifically found that "AME had difficulty in maintaining its records in a professional, business-like manner." The lack of such records has left AME unable to come forth with specific facts to establish its claim for conversion.

Additionally, the trial testimony lacks any specific facts of the alleged conversion of AME tanks. While the trial testimony and the record demonstrate the fact that delivery tickets were altered through the verification process at TESS's facility, it fails to establish that this verification process actually resulted in the conversion of any AME tanks. AME did not come forward with facts demonstrating the essential elements of conversion. Instead, it asserted nothing more than an assumption that TESS used its verification process to convert AME tanks.

On appeal, AME asserts that "[t]o show conversion AME took the top sheet (white) of specific delivery tickets and the gold sheet, left by the TESS driver with AME to show the discrepancies and defects in the way TESS not only billed AME, but also makes claim for the market value of unreturned tanks." This demonstrates that TESS engaged in a verification process and audited its records to correct defects, but it does not prove conversion. AME cannot demonstrate that TESS has any AME tanks in its possession, yet it claims that TESS has converted hundreds of tanks. This claim is not

supported by the record before us.

At trial, AME did not dispute that it is possible for tanks to become lost. Marsha Bain, an AME employee, testified that part of her responsibility was getting outstanding tanks back from patients. She testified that she would try to locate patients with outstanding tanks and that missing tanks not returned by patients is indeed a problem. The testimony at trial demonstrates that it is a clear problem in the industry for tanks to become lost. As previously noted, counsel for AME even acknowledged the fact that "the average loss in the industry, for rental tanks, is 17 percent per year." Instead of accepting that some of its tanks are missing due to the general problem in the industry of tanks becoming lost and patients not returning them, AME seeks to hold TESS accountable for hundreds of tanks that were subject to TESS's auditing process. This is not proof of conversion. We hold that AME has failed to prove the essential elements of its claim for conversion.

## C.

In its brief, AME correctly notes that there is an implied duty of good faith and fair dealing in every contract. The Supreme Court quoted *TSC Industries v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987) with approval, holding that

> "[i]t is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable."

*Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (internal citation omitted). "[T]he purposes of this implied duty are two-fold: to honor the reasonable expectations of the contracting parties, and to protect the rights of the parties to receive the benefits of their agreement." *SecurAmerica Business Credit v. Schledwitz*, No. W2009-02571-COA-R3-CV, 2011 WL 3808232, at *12 (Tenn. Ct. App., filed August 26, 2011).

AME claims that TESS conducted its business in bad faith, unfairly, or in a commercially unreasonable manner. During the trial, the only statement on this issue was in AME's opening statement. Counsel questioned the following:

> Is this contract even conscionable? And the reason that we ask the Court to consider that is because in order for a

- 14 -

contract to be fair and equitable between the parties, there must be a measure of good faith and there must be reasonableness. So if this Court were to . . . make a determination . . . concerning this contract, then we ask the Court to consider those issues that we have raised. Is it conscionable? Was the dealing . . . between the parties fair and equitable? Was there good faith shown by the parties?

AME, however, did not demonstrate why the contact in this case, which is really nothing more than a pricing agreement, is unconscionable. In its memorandum filed in the trial court the day before the court entered its order, AME asserted the following:

TESS owed a duty to AME to fill and deliver oxygen tanks to AME to procure compensation. Good faith and fair dealing required TESS to make each delivery with finality. This is the only circumstance under which AME was obligated to pay for the services. TESS owed a duty to cooperate by having competent and capable delivery persons to make a final decision regarding the accuracy of each delivery. Instead, TESS, without the consent of AME or without its knowledge, altered a considerable number of the deliveries by utilizing an inventory process which AME had no knowledge of, while charging or billing AME off of any changes made by the inventory. . . . The legal premise is this breach of duty by TESS excused the non-occurrence of payment in full by AME.

There are other instances of TESS's non-cooperation. . . . David Graves was consulted to find out what tanks TESS might have that belonged to AME. Graves advised he couldn't help because he did not keep serial numbers of the tanks. . . . Graves did not offer to review or audit the TESS business records; and undertook nothing more than a superficial claimed-audit in 2012 that revealed nothing. This was not cooperation. This was done in bad faith to suppress knowledge of the TESS business practices.

In its brief, AME asserts that, because the contract is silent with regard to how the delivery process will be performed, performance "must be made in good faith and in a commercially reasonable manner." It claims that "[t]he TESS practice of altering delivery tickets after a delivery and billing off of the altered tickets, empirically establishes TESS does not do business in good faith, in fairness, nor in a commercially reasonable manner." We disagree.

- 15 -

"[I]n determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument." *Wallace*, 938 S.W.2d at 686. Furthermore, "[p]erformance of a contract according to its terms cannot be characterized as bad faith." *Id.* at 687. In this case, as already stated, the trial court specifically found that "TESS properly billed AME for gases, tank rental, and tank purchases." We agree.

AME has failed to cite authority for its proposition that or demonstrate how TESS's verification process is in bad faith, unfair, or commercially unreasonable. Because the verification process at the TESS facility resulted in TESS properly billing its clients, we fail to find this proper billing to be in bad faith, unfair, or commercially unreasonable. Good faith is judged against the intent of the parties. *Id.* The contract at issue demonstrates the intent that the parties will be billed under the terms of the agreement. It appears to us that TESS's verification process is the means it uses to enforce its rights under the contract and perform based on the intent of the parties to be billed based upon the agreed upon terms. It is not unreasonable, unfair, or commercially unreasonable for TESS to engage in a process to ensure that it is properly billing its customers. This process ensures that TESS is paid and customers are billed according to the prices agreed on in the contract. AME has failed to demonstrate how this process demonstrates that TESS acted in bad faith, unfairly, or in a commercially unreasonable manner.

Furthermore, there is no evidence in the record to demonstrate that TESS engaged in this verification process for the purpose of overbilling customers. Aside from AME's conclusory assertion that the process resulted in conversion of its tanks — an assertion it has not proven — AME has presented no evidence why, in an industry where there is a problem with tanks becoming lost, a verification process would be in bad faith, unfair, or commercially unreasonable. The fact that AME did not conduct its own audit and track its own tanks leaves AME unable to establish, with evidence, the validity of its claim that TESS overbilled it. We hold that AME has failed to establish that TESS has acted in bad faith, unfairly, or in a commercially unreasonable manner.

## V.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, Advanced Medical Equipment, LLC. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE